Filed 8/31/23

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C093672 |
| Plaintiff and Respondent, | (Super. Ct. No. 14F07784) |
| v. | |
| MONICA NJOKU, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, James E. McFetridge, Judge. Affirmed.

Dale Dombkowski, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Matthew Rodriguez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Christopher J. Rench and Max Feinstat, Deputy Attorneys General, for Plaintiff and Respondent.

---

\* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part III of the Discussion.

Following an evidentiary hearing, the trial court denied defendant Monica Njoku's petition for resentencing pursuant to Penal Code[1] section 1172.6.[2] On appeal, defendant argues insufficient evidence supports the trial court's finding she aided and abetted implied malice murder. In making this argument, defendant contends we should apply the independent review standard when examining the record because neither she nor the prosecution introduced additional evidence at the evidentiary hearing. Defendant also argues any factual disputes should be resolved in her favor because the prosecution did not introduce live testimony at the evidentiary hearing to resolve the factual disputes as it was required to do pursuant to the Fifth and Fourteenth Amendments to the United States Constitution.

In the published portion of this opinion, we reject defendant's contentions that we should independently review the evidence and that the prosecution was required to introduce live testimony. In the unpublished portion of this opinion, we reject defendant's claim that insufficient evidence supports the trial court's finding of implied malice. Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

At defendant's evidentiary hearing, the parties relied on only the trial court transcript and did not introduce any additional evidence. We rely on the facts as related in defendant's direct appeal and supplement them with additional testimony from the trial transcript when appropriate. (*People v. Njoku* (Nov. 19, 2018, C082166) [nonpub. opn.] (*Njoku*).)

---

[1] Further undesignated section references are to the Penal Code.

[2] Effective June 30, 2022, the Legislature renumbered former section 1170.95 as section 1172.6. (Stats. 2022, ch. 58, § 10.) There were no substantive changes to the statute. Although defendant filed her petition under former section 1170.95, we cite to the current section 1172.6.

# I

*Prosecution's Case*

"[Defendant] owned a house in Sacramento. She lived elsewhere, renting rooms in the house to short term tenants, primarily single mothers with children. [Defendant] did not require credit or background checks, and allowed tenants to pay rent and deposits on a flexible schedule and in installments, as they were able. [Defendant] did not observe the usual formalities associated with the landlord/tenant relationship. Some tenants were not required to sign lease agreements. Others signed lease agreements, but were not given copies of those documents. In keeping with her informal approach to landlord/tenant matters, [defendant] also made frequent unannounced visits to the house, using her own key to enter without knocking.

"Although [defendant] generally catered to single mothers, she also rented a room to [Edward W., the victim and] a single father with a two-year-old son. Other tenants in the house during the relevant period included Jasmine M[.], a single mother with an eleven-month-old daughter, and Amanda F[.], a single mother with a five-or six-year-old son. At the time of the events detailed below, [Edward] had been living in the house for two weeks, [Jasmine] for three weeks, and [Amanda] for three months. All had been either homeless or at risk of homelessness prior to taking rooms in [defendant]'s house.

"[Defendant] and [Jasmine] had a disagreement several days before the [murder]. On Friday, November 14, 2014, [defendant] appeared at the house unannounced and learned that [Jasmine] had violated house rules by allowing her sister to spend the night. She confronted [Jasmine], saying, 'You need to get the F out of my house, and I don't care where you go, but you need to go now.' [Jasmine] and her daughter left the house, but returned the following night.

"[Defendant] came back to the house on Sunday, November 16, 2014. [Defendant] confronted [Jasmine] again, saying, 'What are you still doing here?' 'You need to leave.' [Jasmine] responded that she could not 'just leave,' adding that she had a

3

right to three days' notice prior to being evicted. [Defendant] denied that she was under any obligation to give notice, saying, 'you need to get the hell out of my house' and 'this is my house, I don't have to give you a warning about how long you have to be out of here.'

"[Edward], who was standing nearby, interjected. [Edward] agreed that [Jasmine] was entitled to notice. He added that he did not want to continue living in a house in which the parent of a small child could get kicked out without notice. He told [defendant] to stop yelling at [Jasmine] and asked that she refund money he had already paid in rent. [Defendant] angrily responded, 'You can leave, I don't care. And you're not getting your money back.'

"The argument continued in this fashion for some time, with [defendant] and [Edward] yelling back and forth at one another. Eventually, [Edward] called his sister and asked her to pick him and his son up. [Defendant] responded, 'If you are calling your sister I'm calling my family too.' [Defendant] then phoned someone. [Amanda] heard [defendant] tell the person on the other end of the line that she had a tenant who did not want to get out of her house, and she needed help. [Jasmine] heard [defendant] say, 'My tenants are trippin['.] Come. You need to get over here. I'm going to send you the address.' [Defendant] then turned to [Jasmine], saying 'You're about to go. You're about to leave.'

"[Defendant's brother Monterio Roberts and his wife T.S.] knocked on the door a short time later. . . . [Defendant] answered the door and showed Roberts and [T.S.] to a common area (designated by the parties as 'the northeast living room'), which was then occupied by [Edward] and [Jasmine]. A discussion ensued.

"The discussion began civilly enough, with [T.S.] telling [Edward] and [Jasmine] that she was celebrating a birthday that day. The mood changed, however, when Roberts began commenting on [Edward]'s financial circumstances. According to [Jasmine], Roberts said to [Edward], 'We wouldn't have this problem [referring to [Edward]'s

4

dispute with [defendant]] if you was [*sic*] man enough to have a house for your kid; you wouldn't have to be renting a room.'  As [Jasmine] would later testify, 'the argument was getting very heated, it felt like it was going to be a fight any moment.'

"At some point, [Edward] called 911.[3] . . .  On the recording, [Edward] can be heard explaining the situation with [defendant] to the 911 operator in a measured tone of voice as an unidentified woman yells in the background.  Later, [Edward] can be heard interacting with an unidentified man, saying, in a louder tone, 'Don't—no, no, no.  First of all, don't come in my—if we gonna do that we can do that.  Don't—don't—better believe I'm not scared.'  Later still, [Edward] can be heard saying, 'Dude, I've done martial arts all my life.  Best believe I'm not scared.'  [Edward] can also be heard saying, 'Bro, don't come at me like that.'  During the trial, [Jasmine] recalled that Roberts was 'talking smack' and 'running up on' [Edward].  [Edward], for his part, was 'upset' but 'standing still.'  Following a further discussion, which was repeatedly interrupted by people speaking loudly in the background, the 911 operator agreed to send someone to the house.

"A short time later, [defendant], Roberts and [T.S.] announced that they were going to the liquor store.  As they were leaving, [defendant] said, 'We're about to go to the store, and when we come back it's about to get real turnt up in here.'  During the trial, [Amanda] testified that she understood [defendant] to mean that it was going to get 'crazy,' and 'not in the fun way.'

"[Edward] called 911 a second time after [defendant], Roberts and [T.S.] left.  Believing the dispute to be over, [Edward] cancelled the earlier request for assistance, and then went outside and smoked a cigarette with [Jasmine].  [Edward]'s two-year-old

---

[3]     "[Defendant] had called 911 earlier that day, saying that she needed help with some people who were staying in her house and being disruptive.  [Defendant] cancelled the call a short time later."

5

son also went outside. [Jasmine]'s eleven-month-old daughter remained inside (in a common area designated by the parties as 'the southeast living room') eating a snack and watching television in her stroller.

"The calm was short lived. [Defendant], Roberts and [T.S.] returned to the house after approximately thirty minutes. [Edward] and [Jasmine] went back inside. [Amanda] went to her room and closed the door. [Defendant] saw [Jasmine]'s daughter and said, 'Why is the stroller on the carpet?' [Defendant] began to push the stroller towards a sliding glass door leading outside. [Jasmine]'s daughter began to cry. [Jasmine] said, 'Wait, get your hands off my daughter's stroller. You're not pushing my daughter outside.' [Defendant] then reached down and 'yanked' [Jasmine]'s daughter, who was still strapped in, out of the stroller. [Jasmine] said, 'What are you doing? Don't touch my daughter.' [Edward] interjected, saying, 'Don't touch her daughter. You're doing too much. Calm down.' As [Jasmine] would later recall, everyone in the room started 'yelling at each other' and 'getting into it.' With tempers rising, [Edward] called 911 a third time.

"During the course of [Edward]'s third 911 call (the substance of which is described below), [Jasmine] (along with her daughter) and [Edward] moved from the southeast living room to the northeast living room. [Defendant], Roberts and [T.S.] soon followed. [Amanda] and her son remained in their room with the door closed. However, [Amanda] opened the door and peeked out several times during the course of the ensuing altercation.

"An audio recording of [Edward]'s third call to 911 was played for the jury. The recording begins with [Edward] telling the 911 operator, 'We have an emergency here. The landlord has come back and they're trying to fight the girl and . . . [¶] . . . and trying to take the baby and everything.' Moments later, [Edward] can be heard yelling, '[Y]ou locked my son outside? Oh, my fuckin' God.' An irate [Edward] continued, 'Are you fucking serious? You locked my [two year old] outside. Oh, my God. No, she locked

6

my son outside. She locked my son outside. Are—and you're laughing about it? What the fuck. Oh my God, oh my God. God Lord have mercy. Oh, my God.' During the trial, [Jasmine] explained that [Edward] was yelling because his son had been locked outside, and he believed that [defendant] was responsible. [Jasmine] testified that she had not seen [defendant] lock the door, but confirmed that '[defendant] was laughing about it.'

"Moments later, [Edward] can be heard telling the 911 operator, in a more composed tone of voice, 'My name is Edward . . . . They're in this house. We paid rent for it. She hasn't given us our rent back. This—this person is trying to invite more people, somehow he can come get me out of the house and everything like that.' The 911 operator can be heard responding, 'Okay. Who is he?' The following exchange can then be heard:

" '[[EDWARD]]: It's [unintelligible]. I got kids in here.

" '911: Who's he?

" '[[EDWARD]]: I will fight for my rights on everything I love.

" '911: Okay. Edward?

" '[[EDWARD]]: I don't know who this dude is but I guess it's her brother or something like that.'

"By now, [Jasmine] was seated in a recliner with her daughter in her lap. Roberts was standing approximately two feet away from [Jasmine]. [Edward] was standing approximately 16 feet away from Roberts, near the door to a utility room. During the trial, [Jasmine] testified that Roberts was angry, and moving closer to [Edward]. On the 911 recording, [Edward] can be heard saying, 'Dude, I want you to come.'

"[Defendant] and [T.S.] were also in the northeast living room. In [Jasmine]'s opinion, [T.S.] was trying to defuse the situation by drawing [Edward]'s attention to the fact that his son, now in the northeast living room, was unharmed. By contrast, [Jasmine] recalled, [defendant] was 'in [her] face, just trying to fight.'

7

"[Jasmine] watched as Roberts pulled what appeared to be a switchblade knife out of his pocket. [According to Jasmine,] Roberts opened the knife with a flick of the wrist. He then walked across the room towards [defendant] and [Edward], using a gait that [Jasmine] described as 'like a menacing kind of little thug.' The verbal sparring continued. According to [Jasmine], [defendant] 'was talking mess to [Jasmine], talking mess to [Edward], just kind of, in [her] opinion, um, making the scene bigger than what it had to be. It was like egging him on.' As [Jasmine] put it, [defendant] was 'hyping [Roberts] up' and 'playing like the instigator.' On the 911 recording, [Edward] can be heard repeating the words, 'Y'all doin' too much,' against a background of excited crosstalk. Suddenly, Roberts charged [Edward].

"Roberts and [Edward] exchanged blows, with each man landing several punches. [Edward], who was taller, appeared to gain the upper hand. At that point, [defendant] and [T.S.] joined the fray. As [Jasmine] would later testify, 'all four were fighting.' The scene was confusing, however, and [Jasmine] allowed that [T.S.] may have been trying to break up the fight.

"On the 911 recording, the sounds of a scuffle can be heard, punctuated by the sounds of one or more female voices screaming 'Stop' and 'Oh, my God.' A muffled male voice can be heard saying, 'Get off my wife.' During the trial, however, [Jasmine] was adamant that [Edward] did not make physical contact with [T.S].

"The melee moved from the northeast living room to the adjoining utility room. Around the same time, [Amanda] emerged from her room and saw Roberts, [defendant] and [T.S.] 'take [Edward] down.' [Amanda] screamed at the group to stop and ran back to her room. [Amanda] did not see a knife in Roberts'[s] hands.

"[Jasmine], still seated in the recliner, heard [Amanda] yelling 'stop, stop,' and another sound, which she believed to be the sound of [Edward] being stabbed. On the 911 recording, the sounds of a struggle can be heard, followed by the sound of groaning.

8

Upon hearing these sounds, [Jasmine] sprang from the recliner with her daughter in her arms, grabbed [Edward]'s son, and ran out the door.

"Around the same time, [Amanda] emerged from her room again and saw [defendant] and [T.S.] standing on either side of [Edward], who was now lying on the ground in the fetal position. According to [Amanda], [defendant] and [T.S.] were stomping on [Edward]'s upper body. During the trial, [Amanda] testified that she screamed at [defendant] and [T.S.] to stop. [Amanda] recalled that [defendant] looked in her direction but did not appear to see her. In [Amanda]'s words, [defendant] 'whipped her hair around and just looked like in my direction and just turned her head back, and it wasn't her, and then she just kept stomping.' According to [Amanda], [defendant] 'looked crazed.' [Amanda] retreated to her room. Although [Amanda] can be heard screaming at various points on the 911 recording, she could not make out the sounds of her own screaming [or the sounds of stomping], or say when, in relation to the stabbing, the stomping might have occurred.

"On the 911 recording, a man's voice can be heard saying, 'Nigga get your fuckin' hands off me.' Another male voice can then be heard saying, 'You stabbed me really good. You stabbed me. You got me.' Moments later, the same male voice can be heard saying, 'Can somebody help me, please? I don't want to die for my son, please?' A woman's voice responds, 'Get up.'

"[Amanda] stayed in her room, listening, until the sounds of fighting stopped. When she came out, she saw [Edward]'s body lying halfway in the utility room and halfway in the northeast living room. [Defendant], Roberts and [T.S.] were gone. [Amanda] dragged [Edward], who was still alive, into the northeast living room and called 911. As [Amanda] spoke with 911, [defendant] and [T.S.] reappeared. [T.S.], a certified nurse's assistant, instructed [Amanda] to apply pressure to [Edward]'s wounds.

"[Amanda] held [Edward] and waited for paramedics to arrive. As she waited, she noticed [defendant] and [T.S.] running into the utility room and then out of the house, and

9

then back again. During the trial, [Amanda] estimated that [defendant] and [T.S.] completed this circuit at least three times. [Amanda] also noticed that [defendant] and [T.S.] were moving things around in the utility room, as if they were looking for something. During the trial, [Amanda] explained that she thought they were looking for [Edward]'s phone, which was still connected to 911. [Edward], still conscious, was also thinking about the phone. He begged [Amanda] to join the search, saying 'go get the phone because they're not going to be able to prove it unless they have that phone.' Neither [defendant] nor [T.S.] offered to help [Edward], who lay crying in pain on the floor.[4] Instead, [according to Amanda, defendant] told [Edward] to 'shut the fuck up.' [Defendant] then continued rummaging around in the utility room.

"Meanwhile, [Jasmine], having run to a neighbor's house, was placing her own call to 911. [Jasmine] told the 911 operator, 'What happened, right, they started fighting and the guy took out the knife and he ran up on him and then next thing you know [Edward] hit him and then the, uh, guy had a knife again and they just start like crazy ass stuff. It was like a real, you know, scuffle.' Moments later, [Jasmine] said, 'I have no idea what happened. Because most likely he stabbed him because I think the other guy started beating him up so I think he stabbed him because I heard the sound and this is crazy. I can't believe he did that like that. It's crazy.'

"[Jasmine] concluded the call with 911 and walked back to the house. By then, police officers and an ambulance had arrived. [Jasmine] watched as [Edward] was loaded on a stretcher into an ambulance. She then encountered [Amanda]. [Amanda], who had already been contacted by responding officers, told [Jasmine] that she had seen [defendant] and [T.S.] stomping on [Edward], and heard them 'talking shit to him while he was dying.' [Amanda] told [Jasmine] that she had not reported these things to

---

**4** "[Defendant] did, however, place another call to 911, which she ended when she learned that [Amanda] was already on the phone with 911."

10

responding officers, as she had been afraid to do so.[5]  [Jasmine] encouraged [Amanda] to tell police what she had seen.  [Amanda] spoke with detectives a short time later and reported the stomping.

"[Edward] was pronounced dead on November 16, 2014, at 6:14 p.m., an hour after he placed his final 911 call.  An autopsy revealed that [Edward] had been stabbed three times:  once in the chest and twice in the abdomen.  The fatal wound was three and one quarter inches deep and struck [Edward]'s inferior vena cava, a major blood vessel returning blood from the lower part of the body to the heart.  [Edward] died from loss of blood.

"Crime scene investigators found [Edward]'s phone underneath a dryer in the utility room.  Investigators also found bloody clothes in the trunk of a Dodge Avenger parked in front of the house, which was registered to [T.S].  DNA analysis indicated that the blood matched two contributors:  [Edward] and Roberts.  Investigators also found blood on the boots that [defendant] had been wearing at the time of the stabbing.  DNA analysis indicated that the blood on [defendant]'s boots matched [that of Edward].

"Police contacted [defendant] and [T.S.] at the scene.  Roberts surrendered to police eight days later.  He had a cut on his pinky finger and a wound on his stomach.  Police photographed Roberts'[s] injuries.

"During the trial, Dr. Joseph Pestaner, a forensic pathologist, testified for the prosecution about [Edward]'s cause of death." (*Njoku*, *supra*, C082166.)  When asked about Edward's injuries, Dr. Pestaner testified to two hemorrhages located on Edward's head and abrasions on his arms and lips.  When asked about stomping as a potential cause

---

**5**    "During the trial, Deputy Adrian Zuniga, who responded to the scene, testified that [Amanda] said that she had not seen any part of the altercation.  [Amanda] explained that she had been afraid to tell Zuniga the truth, as [defendant] had been standing nearby."

11

of Edward's injuries, Dr. Pestaner testified he would have expected to see more serious injuries if Edward had been exposed to extensive stomping.

## II

### *Defense Case*

"Roberts testified in his own defense.  Roberts explained that he planned to have drinks with [defendant] and [T.S.] at the house to celebrate [T.S.]'s birthday.  He denied that [defendant] called him to help her in evicting her tenants.  He also denied discussing the eviction of [Jasmine] and [Edward] during the trip to the liquor store with [defendant] and [T.S].

"Roberts testified that he went into the kitchen after returning from the liquor store and overheard the confrontation between [defendant] and [Jasmine] in the southeast living room.  Roberts testified that [defendant] ordered [Jasmine] to leave, and [Edward] interjected, saying 'that's not fair, she shouldn't have to get out, and if she has to leave, he'll leave or something like that.'  According to Roberts, a discussion of prorated rent ensued, which came to an end when [Edward] discovered that his son had been locked outside.  At that point, Roberts testified, [Edward] started screaming and 'got in [defendant's] face.'  According to Roberts, 'He was pretty much pushing up on her, real close to her, and he kept saying that she locked his son outside.'  Roberts testified that he tried to separate [Edward] and [defendant], but only succeeded in drawing [Edward]'s ire.

"In Roberts'[s] retelling, an enraged [Edward] reached over the heads of [defendant] and [T.S.], who were standing between the two men, and struck Roberts at least three times.  During the course of the altercation, Roberts said, the group backed into the utility room.

"In the utility room, Roberts said, [Edward] 'was swinging wildly, hitting everyone, hitting me some more, hitting my wife and sister.'  Although Roberts 'got a couple of punches in,' [defendant] and [T.S.] were both knocked to the ground.  And Roberts himself was 'getting beat on.'  According to Roberts, the brawl escalated further

12

when [Edward] 'went down on one knee,' 'buried his head into my stomach,' clamped down with his teeth, and shook his head, 'like he was a pit bull or something.' Roberts testified that [Edward] briefly let go, and then bit him again. Roberts explained that the biting caused him to groan in pain, adding that some of the groaning sounds on the 911 recording came from him, not [Edward]. It was at that point, Roberts continued, that he pulled out his knife and stabbed [Edward]. According to Roberts, 'I didn't even want to stab him, but he wouldn't stop, and he was hurting my wife and hurting my sister and hurting me.' Roberts explained that he left the scene of the crime, and threw away the knife because he was scared.

"[T.S.] also testified. [T.S.] explained that she and Roberts agreed to meet [defendant] at the house because they were planning to eat dinner in the area. [T.S.] maintained that [defendant] did not say anything about problems with tenants when the plan for the evening was conceived.

"Turning to the events immediately preceding the stabbing, [T.S.] recalled that she returned from the liquor store with [defendant] and Roberts and found [Jasmine]'s baby eating noodles in her stroller in front of the television. Seeing the baby eating over the carpet, [defendant] became agitated and grabbed the stroller. [Jasmine] said, 'Don't touch my baby.' [Edward] appeared, taking [Jasmine]'s side in what was then still a verbal altercation. The group moved from the southeast living room to the northeast living room. [Edward] discovered that his son had been locked outside and became 'hyped' and 'angry.' [T.S.] tried to defuse the situation by pointing out that [Edward]'s son was unharmed. In [T.S.]'s words, however, 'he didn't calm down. He got angry.' According to [T.S.], [Edward] 'kinda, you know, pushed me out of the way. And then, um, I stumbled a little bit to my right, I believe.' The next thing she knew, [T.S.] continued, 'the men were tussling.'

"[T.S.] testified that [Edward] and Roberts traded blows, and then backed into the utility room. [Edward] gained the advantage, getting on top of Roberts, who was on the

floor. [T.S.] grabbed [Edward]'s shirt and attempted to pull him off. As she did so, she heard Roberts say that [Edward] was biting him. She then heard 'a grunt kinda noise' and the sound of glass breaking. Moments later, the fight was over. [T.S.] testified that she did not see Roberts produce or use a knife. [T.S.] denied stomping on [Edward], and testified that she did not see [defendant] stomping on [Edward] either.

"After the stabbing, [T.S.] testified that she went outside to see whether police were coming. She then went back inside. [T.S.] denied that she rummaged through the utility room, searching for [Edward]'s phone. [T.S.] also stated that she did not appreciate the severity of [Edward]'s injuries in the immediate aftermath of the stabbing.

"On cross-examination, the prosecutor impeached [T.S.] with a video recording of an interview in which she told police that she was outside at the time of the stabbing and did not know the man with the knife. [T.S.] admitted that she lied to police. She explained that she was scared and trying to protect her husband. She added that, 'I was absolutely wrong for lying, and I'm not proud of that, especially looking back at the tape. It was wrong.' Several character witnesses testified that [T.S.] has a reputation for helping others and finding peaceful solutions to interpersonal conflicts." (*Njoku*, *supra*, C082166.)

A jury found defendant and Roberts guilty of second degree murder and acquitted T.S. of all charges. (*Njoku*, *supra*, C082166.)

III

*Evidentiary Hearing*

After reviewing the transcript of defendant's trial, the trial court denied defendant's petition.

Factually, the trial court described the parties' positions as follows: "The parties dispute the role [defendant] played in the murder of Edward . . . on November 16, 2014. They dispute whether the evidence shows [defendant] acted with implied malice by egging on the knife wielding [Roberts] and then joining him in the deadly assault,

14

including stomping on the victim and the stabbing that caused the victim's death, or whether the evidence shows that [defendant] merely committed an assault without sufficient proof that she knew [Roberts] had a knife. A secondary point to the defense argument is the record is too muddled to make any conclusions about [defendant]'s state of mind based on a proof beyond a reasonable doubt 'of each and every element of malice' standard."

Ultimately, the trial court found "that the entire atmosphere of hostility toward the victim was generated and pushed by [defendant]. A fist fight between co-defendant Roberts and the victim ensued. Once the victim decided to fight back, the knife came out and [defendant] acted in concert with co-defendant Roberts to subdue and murder the victim. [Jasmine] saw Roberts holding the knife as he walked toward [defendant] and then paused next to her. She also saw [defendant] looking at Roberts when he had the knife out. Common sense indicates [defendant] knew her brother had a knife and encouraged him to go after the victim and joined in the brutal assault that led to his death. [Amanda] testified that she thought all three assailants killed the victim. [Defendant] fueled the animosity towards the victim and contributed toward the fatal attack with stomping and telling him to shut the f- - - up after his stabbing with blood 'everywhere' while he lay in the throes of death."

Defendant appeals.

DISCUSSION

"Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) amended the felony-murder rule to provide: 'A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in

15

the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2 [the statute defining felony-murder special circumstances].' (§ 189, subd. (e).) The new law was designed 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)

"The Legislature also added former section 1170.95 (now section 1172.6), which creates a procedure for offenders previously convicted under a felony-murder theory to obtain the benefits of these changes retroactively. Under the statute, individuals convicted of murder can petition for relief in the court where they were sentenced if (1) the complaint or information filed against them 'allowed the prosecution to proceed under a theory of felony murder . . . ,' (2) they were convicted of murder following a trial, and (3) they could not now be convicted of murder 'because of changes to [s]ection 188 or 189.' (Former § 1170.95, subd. (a); see now § 1172.6, subd. (a).) In most cases where the petitioner makes a prima facie showing that he or she is entitled to relief, the court must hold an evidentiary hearing at which the prosecution bears the burden of proving, 'beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under state law as amended by Senate Bill [No.] 1437 (2017-2018 Reg. Sess.). (§ 1172.6, subd. (d)(3).) 'A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' (*Ibid*.)" (*People v. Oliver* (2023) 90 Cal.App.5th 466, 477-478 (*Oliver*).)

I

*The Applicable Standard Of Review Is Substantial Evidence*

"Ordinarily, a trial court's denial of a section 1172.6 petition is reviewed for substantial evidence." (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) Relying on *People v. Vivar* (2021) 11 Cal.5th 510, defendant contends her case is different because

16

the trial court's inquiry was limited to a "cold record," thus deference to the court's factual findings on appeal is unwarranted. We disagree and adopt the reasoning of *Oliver*, *supra*, 90 Cal.App.5th 466.

"In *People v. Perez* (2018) 4 Cal.5th 1055, our Supreme Court considered and rejected an argument similar to [defendant]'s in the context of a Proposition 36 petition for recall of sentence. The People argued that [independent] review was 'more appropriate because trial courts do not have an advantage over appellate courts in determining eligibility based on the record of conviction.' (*Perez*, at p. 1066.) [Our] Supreme Court disagreed, concluding that 'even if the trial court is bound by and relies solely on the record of conviction to determine eligibility, [where] the question . . . remains a question of fact . . . we see no reason to withhold the deference generally afforded to such factual findings.' (*Ibid*.)

"[*People v.*] *Vivar*, *supra*, 11 Cal.5th 510, is distinguishable. There, our high court endorsed an independent standard of review when evaluating a trial court's decision under section 1473.7 regarding whether to vacate a conviction due to negative immigration consequences. (*Vivar*, at pp. 524-527.) 'A successful section 1473.7 motion requires a showing, by a preponderance of the evidence, of a prejudicial error that affected the defendant's ability to meaningfully understand the actual or potential immigration consequences of a plea.' (*Vivar*, at p. 517, italics omitted.) In choosing independent review in this context, [our] Supreme Court reasoned that analogous prejudice determinations in ineffective assistance of counsel claims were reviewed independently as predominantly legal questions; that the interests at stake supported independent review where the determination was likely to be made from a cold record; and that prior appellate decisions had reviewed such prejudice determinations independently, but the Legislature, aware of this standard, did not alter it when amending the statute. (*Id*. at pp. 524-527.) [Our] Supreme Court went on to emphasize that its holding was 'a product of multiple factors with special relevance' in that context (*id*. at

17

p. 527) and reaffirmed the 'familiar postulate' that ' "an appellate court should defer to the factual determinations made by the trial court," ' regardless of ' "whether the trial court's ruling[s are based] on oral testimony or declarations" ' (*id*. at p. 528, fn. 7).

"We conclude that *Perez*, rather than *Vivar*, controls here. Whether [defendant harbored the malice required for a finding of second degree murder] is predominantly a factual question reviewable for substantial evidence. Other courts considering the issue have reached a similar conclusion. (See *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 232-233 [Division Four of the First District rejecting *Vivar* and concluding that whether the petitioner knew or reasonably should have known that the victim was a police officer under the resentencing statute was predominantly a factual question reviewable for substantial evidence]; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 590-591 [Second District rejecting *Vivar* and concluding that 'substantial evidence support[ed] the finding, beyond a reasonable doubt, that Mitchell was a major participant in a felony who acted with reckless indifference to human life']; *People v. Clements* (2022) 75 Cal.App.5th 276, 283, 302 [Fourth District rejecting *Vivar*; concluding that 'the trial judge sits as a fact finder at a hearing under section 1170.95, subdivision (d) [now § 1172.6, subd. (d)] and that substantial evidence support[ed] the trial judge's finding beyond a reasonable doubt that Clements committed implied malice second degree murder'].)" (*Oliver*, *supra*, 90 Cal.App.5th at pp. 479-480.)

Defendant urges us to reach a different conclusion and argues reliance on *Perez* is misplaced. Specifically, she argues that whether the substantial evidence standard of review applies to a trial court's findings under Proposition 36 was not a central issue in *Perez* because, under the facts of that case, our Supreme Court relied on undisputed evidence and believed the trial court's finding was unsupported based on those undisputed facts. Thus, defendant reasons, because our Supreme Court would have come to the same conclusion had it applied either an independent judgment or substantial

18

evidence review standard, the portion of the opinion describing the proper standard of review as substantial evidence review is dicta.

We disagree. Even if not determinative of the case before it, our Supreme Court directly addressed the issue of the proper standard of review, and its holding was express. (*People v. Perez*, *supra*, 4 Cal.5th at p. 1066.) Further, dicta of our Supreme Court has persuasive value that we cannot ignore absent a compelling reason. (*Benton v. Benton* (2019) 39 Cal.App.5th 212, 218.) Defendant has failed to demonstrate a compelling reason here where Justice Corrigan's concurrence in *Perez* would have decided the case on the theory defendant now advances, but the concurrence failed to gain the support required to be the majority opinion. (*Perez*, at pp. 1068-1070 (conc. opn. of Corrigan, J.).) Accordingly, we are not persuaded to divert from *Perez*.

Defendant also argues the considerations outlined in *Vivar* to justify independent judgment review also favor the use of independent judgment review for section 1172.6 cases when the evidence consists of documentary evidence. Again, we disagree. Whereas the prejudice issue at the center of *Vivar* was a legal question traditionally afforded independent judgment review (*People v. Vivar*, *supra*, 11 Cal.5th at pp. 524-525), the issue here is a factual one traditionally afforded substantial evidence review (*Oliver*, *supra*, 90 Cal.App.5th at p. 480). Further, defendants petitioning under section 1172.6 are currently imprisoned and given an opportunity to present additional evidence not admitted at their trial (§ 1172.6, subd. (d)(3)), whereas the relief at issue in *Vivar* could only be granted to individuals who had been released from confinement and who predominantly relied on records from long past legal proceedings (*Vivar*, at pp. 526-527). Accordingly, the history and nature of the claims at issue in *Vivar* and at a section 1172.6 evidentiary hearing are distinguishable such that the independent judgment review justified in *Vivar* is not justified here. Accordingly, the substantial evidence standard of review is appropriate.

## II

*The Prosecution Was Not Required To Rely On Live Testimony To Meet Its Burden*

Defendant argues section 1172.6 "leaves open the question whether the court can resolve disputed facts on a cold record or whether the court must rely solely on undisputed facts plus any new evidence presented at the hearing." She insists that for the trial court to rely on the cold record alone to resolve disputed facts revealed by that record violates due process under the Fifth and Fourteenth Amendments to the United States Constitution, and as a result the prosecution failed to meet its burden of demonstrating she is ineligible for resentencing. We disagree.

As an initial matter, we note section 1172.6 is not silent about the trial court's role in evaluating the evidence, whether that evidence consists of only a cold record or of the cold record and evidence admitted at the evidentiary hearing, before determining whether a defendant is entitled to resentencing. Indeed, section 1172.6 provides: "The admission of evidence in the hearing shall be governed by the Evidence Code, except that *the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law* . . . . The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary [examination] pursuant to subdivision (b) of [s]ection 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. *The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens.*" (§ 1172.6, subd. (d)(3), italics added.)

"It's true that it's unusual to ask the trial judge to sit as the fact finder and (in some cases) make factual determinations on a cold record . . . . While that is not the ideal position for a fact finder, it is possible to review a trial transcript and reach an opinion about what actually happened. The Legislature landed on that compromise as a way of extending the ameliorative benefits of its redefinition of murder to people previously

20

convicted under prior law, which [it] judged to be too harsh. [It] could have directed that qualifying offenders receive a new trial by a new jury on the critical factual questions. But that was impractical for many reasons; the expense would have been enormous and the chances of obtaining live testimony from witnesses who remembered the events from years or decades earlier is small. The Legislature also could have simply refused to make the benefits of the new law available to people already validly convicted under the old law. [It] chose the middle course of requiring trial judges to decide the critical factual questions based—at least in some cases—on a cold record. While the Legislature's compromise is not perfect, it is adequate. And if either party believes it's important to put on live testimony to allow the trial judge to make credibility determinations based on cues other than consistency and plausibility, the statute expressly allows them that opportunity." (*People v. Clements*, *supra*, 75 Cal.App.5th at p. 297.)

Permitting a trial court to resolve disputed facts in the absence of live testimony at a section 1172.6 resentencing hearing further does not violate defendant's right to due process under the Fifth and Fourteenth Amendments to the United States Constitution, as defendant contends. A petitioner under section 1172.6 does not possess many of the constitutional rights afforded to a criminal defendant at trial. (See *People v. Lewis* (2021) 11 Cal.5th 952, 973 [a petitioner under § 1172.6 is not constitutionally entitled to counsel in the proceeding, but rather, possesses "a purely statutory right to counsel that attaches before the issuance of an order to show cause"]; *People v. James* (2021) 63 Cal.App.5th 604, 610 ["a convicted person litigating a section [1172.6] petition does not enjoy the rights that the Sixth Amendment guarantees to criminal defendants who have not yet suffered a final conviction," including the right to a trial by jury]; *People v. Hernandez* (2021) 60 Cal.App.5th 94, 111 ["The retroactive relief provided by section [1172.6] is a legislative 'act of lenity' intended to give defendants serving otherwise final sentences the benefit of ameliorative changes to applicable criminal laws and does not result in a new trial or increased punishment that could implicate the double jeopardy clause"];

21

*People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156 ["the retroactive relief [defendants] are afforded by Senate Bill [No.] 1437 [(2017-2018 Reg. Sess.)] is not subject to Sixth Amendment analysis"].) This is because " 'a sentence modification under section [1172.6] is an act of lenity and not a criminal trial.' " (*People v. Anderson* (2022) 78 Cal.App.5th 81, 90.)

Indeed, defendant received the benefit of credibility determinations based on live testimony when she was initially tried for murder at her criminal jury trial. The resentencing process cannot result in additional punishment and is a completely voluntary endeavor on defendant's behalf. "No constitutional provision required the Legislature to authorize relief under the conditions specified in section [1172.6] and none compels it to make the conditions subject to jury determination" or other constitutional mandates. (*People v. James*, *supra*, 63 Cal.App.5th at p. 609.) Thus, to the extent defendant characterizes the role of the court as determining her guilt, that characterization is flawed. The trial court is not determining guilt; it is determining eligibility for resentencing based on a reasonable doubt standard. (§ 1172.6, subds. (a), (d).)

For these reasons, we agree with the People's argument that defendant received adequate procedural due process during the resentencing hearing. Factors relevant to this inquiry take into account: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [third], the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Mathews v. Eldridge* (1976) 424 U.S. 319, 335.)

As described, the private interest at stake is whether defendant is entitled to a reduced sentence after having already been found guilty of murder. (§ 1172.6, subds. (a), (d).) Defendant is entitled to introduce additional evidence pertaining to her culpability in the event the evidence revealed by the trial record is incomplete or leads to a

22

conclusion adverse to her position. (*Id.*, subd. (d)(3).) The government has provided for procedural safeguards by extending the right to counsel, providing for an evidentiary hearing that permits the introduction of evidence, and limiting the evidence to that which is reliable or admissible under current law. (*Id.*, subds. (b)(3), (d)(3).) These procedural safeguards account for the credibility concerns raised by defendant by providing a petitioner with the tactical decision to introduce evidence relevant to credibility determination or to rely on the argument that the prosecution has failed to meet its burden. Finally, the cost of holding a new trial for every defendant who could possibly benefit from the passage of section 1172.6 would be extremely high and detrimental to the efficiency of all court business. As described by the *Clements* court, "While the Legislature's compromise is not perfect, it is adequate." (*People v. Clements*, *supra*, 75 Cal.App.5th at p. 297.)

The cases defendant relies on do not support her position. For example, in *United States v. Raddatz* (1980) 447 U.S. 667, the Supreme Court considered the constitutionality of a provision permitting federal magistrate judges to hold suppression hearings before district courts "decide such motions based on the record developed before [the] magistrate" judge. (*Id.* at p. 669.) After determining the statute at issue did not require the district court to hold a hearing at which it could hear the evidence for itself, the Supreme Court determined the United States Constitution did not require such procedural hurdles either. (*Id.* at pp. 676-677, 680-681.) The Supreme Court cautioned judges to be sensitive about making credibility determinations on a cold record but concluded the practice was permissible in the suppression motion context because the interests at stake at a suppression hearing are of a lesser magnitude than those in the criminal trial itself and because the district court holds broad discretion to reject or modify the magistrate's findings or to conduct a hearing. (*Id.* at pp. 679-681.) This case supports our analysis above, in that the interests at stake in a resentencing proceeding are

of a lesser magnitude than those in a criminal trial and other procedural safeguards are in place such that live testimony is not required.

In *Johnson v. Finn* (9th Cir. 2011) 665 F.3d 1063, 1066, the Ninth Circuit Court of Appeals held that a district court must hold a hearing on a *Batson*[6] motion before rejecting the credibility findings of the magistrate judge who first heard the motion. In so holding, the Ninth Circuit paid particular attention to the limitations of a cold record when making credibility assessments. It concluded, "[Petitioners] were constitutionally entitled to have the district judge observe the prosecutor's demeanor before rejecting their *Batson* claim. Because the petitioners' interest in the vindication of their rights is immense, because the administrative burden of an additional hearing is relatively minor, and because a credibility determination based on a cold record is substantially more likely to be in error than one based on an in-person evaluation of a witness, the district judge deprived [petitioners] of due process when he declined to afford them a new evidentiary hearing." (*Id.* at pp. 1075-1076.)

*Johnson* is distinguishable for the reasons outlined above. In short, defendant's private interests are not similar to the interests held by the petitioners in *Johnson* because she has already been afforded a full criminal trial. The administrative burden on the government is immense and procedural safeguards are in place such that defendant could have utilized live testimony to undercut the prosecution's argument that it met its burden based on the cold record alone.

---

**6**    *Batson v. Kentucky* (1986) 476 U.S. 79.

*Substantial Evidence Supports The Trial Court's*

*Finding Defendant Committed Second Degree Murder[7]*

Defendant contends substantial evidence does not support the trial court's finding that she acted with conscious disregard for life when aiding and abetting the assault on Edward. We disagree.

"In reviewing the trial court's findings for substantial evidence, we apply well settled principles. 'We " 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the necessary fact] beyond a reasonable doubt.' " [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt.' " (*Oliver*, *supra*, 90 Cal.App.5th at p. 480.) Reversal is not warranted unless " ' "upon no hypothesis whatever is there sufficient substantial evidence to support the [trial court's ruling]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

"[S]econd degree murder . . . is 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.] . . . 'Malice is implied when the killing is proximately caused by " 'an act, the natural

---

**7** Because we conclude the proper standard of review is substantial evidence, we do not address defendant's fourth claim that upon an independent review she cannot be found guilty of murder.

consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his [or her] conduct endangers the life of another and who acts with conscious disregard for life.' " [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another.' " (*People v. Cravens*, *supra*, 53 Cal.4th at p. 507.)

"[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.' " (*People v. Gentile* (2020) 10 Cal.5th 830, 843, quoting *People v. Perez* (2005) 35 Cal.4th 1219, 1225.) " '[T]o be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' " (*People v. Reyes*, *supra*, 14 Cal.5th at p. 991.) Implied malice simply "requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*People v. Knoller* (2007) 41 Cal.4th 139, 143.)

Defendant invites us to reweigh the evidence by pointing to several omissions and inconsistencies in the order containing the trial court's factual recitation of the trial transcript. We decline to do so. (See *People v. Nelson* (2011) 51 Cal.4th 198, 210 [" 'We do not reweigh evidence or reevaluate a witness's credibility' "].) The court identified the relevant question in its order—whether defendant acted with implied malice when egging on the knife wielding Roberts and then stomping on Edward after Edward had been stabbed. In this regard, the trial court found defendant created the antagonistic atmosphere preceding the murder. This is supported by Jasmine's testimony, which the trial court found credible, that defendant picked a fight about

26

Jasmine's infant daughter immediately upon returning from the liquor store. (*Njoku*, *supra*, C082166.) Defendant then laughed at Edward when he became upset about his young son being locked outside. (*Ibid.*) Tensions escalated quickly with everyone talking or yelling and defendant antagonizing Jasmine and Edward, and in the process encouraging Roberts. (*Ibid.*; see *People v. Young* (2005) 34 Cal.4th 1149, 1181 [the testimony of a single witness is sufficient to support a finding as to any fact].)

The trial court also found Jasmine was credible when testifying that defendant continued to encourage Roberts to fight with Edward after Roberts had displayed a knife. (*Njoku*, *supra*, C082166.) The trial court pointed to defendant's proximity to Roberts to justify the inference defendant knew Roberts possessed a knife when she encouraged him to fight with Edward. This is a reasonable inference we are bound to accept. (*Pilliod v. Monsanto Co.* (2021) 67 Cal.App.5th 591, 641-642 [we review the judgment in light of every reasonable inference].)

The trial court further found Amanda's testimony was credible when she related her perceptions that defendant stomped on Edward and made disparaging comments to him while he was dying. The fact that Amanda could not discern particular people speaking or the sound of stomping on the 911 call is of little consequence. We do not have a copy of the 911 call. Instead, we have a transcript of the call and testimony regarding the call. From these sources, it appears there were a myriad of undiscernible noises on the 911 call and the location of Edward's phone in relation to the altercation is unknown, leaving little context for us to assess the probative nature of the 911 call as compared to Amanda's testimony. Further, Dr. Pestaner testified to injuries Edward sustained that were consistent with stomping injuries. While Dr. Pestaner testified he believed worse injuries would have resulted if the stomping was extensive, that does not preclude a finding that defendant stomped on Edward to some degree after he had been stabbed, contrary to defendant's contention.

27

Finally, the trial court reweighed the evidence when making its reasonable doubt finding, and thus the prosecution's argument and theory of the case, as well as the jury's verdict acquitting T.S., are irrelevant, contrary to defendant's contention.

Defendant also compares her facts to *Valenzuela*, arguing her conduct was not as bad as the conduct in that case and thus does not justify an implied malice finding. (*People v. Superior Court (Valenzuela)* (2021) 73 Cal.App.5th 485.) Initially, we note the futility of comparing cases in a sufficiency of the evidence context. "When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) Further, *Valenzuela* pertained to the required finding at a preliminary examination and involved a prearranged fist fight where the defendant's group brought knives, leading to the death of a person in the other group. (*Valenzuela*, at pp. 491-495.) While noting the case was close, the *Valenzuela* court found sufficient evidence to hold the defendant to answer based on a finding the defendant could at least infer his coparticipant was armed with a knife. (*Id.* at pp. 490, 503-504.) Here, the trial court found defendant knew Roberts was armed with a knife before she continued to encourage him to fight Edward, distinguishing *Valenzuela*.

At bottom, it appears defendant is arguing that she did not know Roberts had come to the house with a knife or had a violent disposition, and thus an implied malice finding was inappropriate. Not so. As the trial court found, defendant created an antagonistic atmosphere by escalating the argument with Jasmine and Edward at every turn and then encouraged Roberts to fight with Edward knowing Roberts was armed with a knife. (See *People v. Vargas* (2022) 84 Cal.App.5th 943, 955 [substantial evidence supported a finding of conscious disregard when the defendant "knew that firing a gun into a brawl could . . . result in someone's death, but she directed [the perpetrator] to do it anyway"].) Defendant then participated in the fight by stomping on Edward and then failed to help him after he had been fatally injured. Taken together, defendant knew Roberts fighting

Edward while brandishing a knife could result in Edward's death. She ignored that risk, and even increased it, by participating in the assault after Edward was stabbed and then callously ignoring him and attempting to hide evidence while he laid on the ground bleeding to death. Accordingly, substantial evidence supports the trial court's finding that defendant acted with implied malice.

## DISPOSITION

The trial court's order denying defendant's section 1172.6 petition is affirmed.

 

/s/
ROBIE, J.

 

We concur:

 

/s/                              ,
EARL, P. J.

 

/s/
KRAUSE, J.